IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 9, 2020

## CHRISTOPHER M. FERRELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3327    Steve R. Dozier, Judge**

————————————————————

### No. M2019-00726-CCA-R3-PC

————————————————————

Petitioner, Christopher M. Ferrell, appeals from the denial of his petition for post-conviction relief from his 2015 conviction for second degree murder. Petitioner contends that he received the ineffective assistance of counsel at trial and on direct appeal. Following our review of the record, we affirm the denial of the petition.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Christopher M. Ferrell.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Evidence presented at trial*

Petitioner was charged and convicted of second degree murder in the shooting death of Wayne Mills. *State v. Christopher Michael Ferrell*, M2015-01011-CCA-R3-CD, 2016 WL 6819784 (Tenn. Crim. App. Nov. 18, 2016), *perm. app. denied* (Tenn. Mar. 9, 2017). The shooting occurred in the early morning hours of November 23, 2013. Earlier in the evening, the victim and Eric Lee Beddingfield attended a George Jones tribute concert in downtown Nashville. *Id*. at *1. Following the event, the victim told Mr. Beddingfield that he was going to see Shooter Jennings perform "at a show downtown somewhere." *Id*. The victim texted Mr. Beddingfield sometime between 2:00 and 2:30 a.m. and told him that Petitioner had invited Mr. Jennings and him to go to

Petitioner's bar, the Pit and Barrel. *Id*. When Mr. Beddingfield arrived at Petitioner's bar sometime between 2:30 and 3:00 a.m., the victim and others were already there. Petitioner was serving drinks, and neither Petitioner nor the victim appeared intoxicated. *Id*. Mr. Beddingfield left the bar sometime between 4:00 and 4:30 a.m. He testified that "[i]t was a great mood" and "there was no tension and there w[ere] no arguments." *Id*. at *2.

Thomas Howard arrived at Petitioner's bar with Susan Branam and Nadia Markham sometime between 2:00 and 2:30 a.m. Mr. Howard testified that the atmosphere at the bar was "relaxed for the most part." *Id*. Mr. Howard, Ms. Branam, and Ms. Markham were preparing to leave the bar at around 4:30 a.m. Mr. Howard testified that the victim and Petitioner were the only people remaining at the Pit and Barrel. *Id*. He testified that he saw the victim sitting at the bar smoking a cigarette. Defendant walked up to the victim, slapped the cigarette out of his hand, and told him that it was a non-smoking bar. *Id*. Mr. Howard testified that the victim stood up and "paced back-and-forth a few times going toward the door." Mr. Howard thought the victim was leaving, but the victim turned around and said to Petitioner, "if you ever smack my hand like that again, I'll kill you." *Id*.

Ms. Branam and Ms. Markham left the bar, and Mr. Howard was about to walk out when he turned around and saw the victim throw a glass on the ground and break it. *Id*. at *3. Mr. Howard "took a few steps" outside and heard the bar door open. Mr. Howard testified, "just as soon as I heard the door open, I heard three shots in rapid succession." *Id*. Mr. Howard turned around and saw the victim on the ground. He testified that the victim fell facedown, and he did not see anything in the victim's hands. *Id*.

Petitioner called 911 at 4:56 a.m. and stated that someone had pulled a gun on him and that there was "no danger now[.]" *Id*. Petitioner told a responding officer that the victim "tried to rob" him and that Petitioner "thought [the victim] was going to kill [Petitioner]." The officer testified that Petitioner "was kind of hysterical[.]" *Id*. Petitioner had dragged the victim inside the bar. The victim was "lying face up" with towels underneath him. *Id*. at *4. He was "breathing heavily" and had been shot in the back of his head. The victim was taken to a hospital where he died later that morning. *Id*.

Sergeant Michael Kent, of the Metro Nashville Police Department, testified that Petitioner looked "very upset." He testified that Petitioner said to him, "I just shot my friend in the head. Oh, my God, I just shot my friend in the head. He said he was going to kill me and I just shot him." *Id*.

Detective Leonard Peck, Jr., the lead investigator in the case, took a statement from Petitioner after Petitioner was transported to the police station. Petitioner stated that the victim was "drunk, drunk" that night. *Id*. Petitioner stated that the victim became "progressively [ ] more belligerent" throughout the morning. *Id*. Petitioner told Detective Peck that the shooting occurred after he saw the victim smoking at the bar. Petitioner explained that he was "vehemently against any smoking in [his] bar," and he reached across the bar and crushed the victim's cigarette. *Id*. Petitioner stated that the victim "went off[.]" Petitioner told the victim to leave, and he told the victim that he could not take his drink outside. Petitioner stated that the victim threatened to kill him and threw his drink on the ground. Petitioner stated that he saw the victim "grab something that [he] thought was a gun." *Id*.

Petitioner stated that he did not intend to shoot the victim but that the victim "scared the hell out of [him]." *Id*. Petitioner pulled a gun that he kept behind the bar and shot in the victim's direction. Petitioner saw the victim fall out the door and onto the ground. He dragged the victim back inside the bar and placed towels under his head. Petitioner told Detective Peck that he found a .45 caliber revolver that Petitioner normally kept beside the cash register on the floor in the doorway. *Id*. at *5. He stated that he did not know how the victim got the revolver. Detective Peck pressed Petitioner, and Petitioner admitted that he had panicked and placed the revolver there. Petitioner stated that the victim had pointed his cell phone at him, but that he thought at that moment, the victim was going to shoot him. *Id*.

Detective Peck left the interview room. A video recording of the interview that was played for the jury showed Defendant alone in the room crying and asking, "Wayne, you stupid son of a b---h, why did you do that?" *Id*. When Detective Peck returned to the room, he advised Petitioner of his *Miranda* rights. At that point, Petitioner asked if he was under arrest, and Detective Peck responded that he just wanted to get "an official statement." *Id*.

Nadia Markham testified for Petitioner. She testified that she and Mr. Howard were "heavily" intoxicated and that they spent most of their time there that night either outside smoking or in the bathroom. *Id*. at *7-8. Ms. Markham testified that she and Mr. Howard were in the bathroom having a "rendezvous" just before they left the Pit and Barrel. She saw the altercation between Petitioner and the victim at the bar over the victim's smoking. Ms. Markham did not witness the shooting. She testified that she was getting into Ms. Branam's vehicle when she heard the "[v]ery loud" sound of glass breaking followed by three gunshots. *Id*. at *8.

A more detailed summary of the evidence presented at trial is found in the opinion on direct appeal. *Id*. at *1-11. Following a jury trial, Petitioner was convicted of second

- 3 -

degree murder and sentenced by the trial court to 20 years' incarceration to be served at 100 percent. Petitioner's conviction and sentence were affirmed on direct appeal.

### *Post-conviction hearing*

Trial counsel testified that he had been an attorney since 1974. His practice consisted primarily of criminal defense. Trial counsel became involved with Petitioner's case within two or three days after the shooting, and trial counsel represented Petitioner throughout the entirety of the direct appeal. Trial counsel testified that he spent "an enormous amount of time" investigating Petitioner's case and preparing for trial. He testified that he had "multiple conversations" with Petitioner, and trial counsel believed that Petitioner "understood what he was charged with and understood what [trial counsel] was saying[.]"

Trial counsel engaged two former Davidson County law enforcement officers as private investigators in the case. Trial counsel's son, also an attorney, assisted with the defense. Trial counsel, his son, and the two former detectives re-created the crime scene.

Trial counsel testified that "the case centered upon self-defense[.]" He testified, "given the facts of the case, that there was [an] extremely high probability of [Petitioner] being convicted of some offense." Trial counsel hoped to get a conviction for a lesser-included offense. Trial counsel testified that the evidence at trial showed that the victim was "extremely intoxicated" and that he "became violent and erratic in his behavior" and "threatened [Petitioner] saying he was going to kill him." Trial counsel's strategy included proving that the victim "was a dear friend" of Petitioner's, and the victim "unexpectedly erupted" when Petitioner would not allow him to smoke inside his bar.

Trial counsel testified that Petitioner suggested witnesses to testify at trial. Trial counsel interviewed several witnesses, including Ms. Branam, before trial. Trial counsel testified that the State had subpoenaed Ms. Branam and Ms. Markham but chose not to call either witness in its case-in-chief. Trial counsel believed that Ms. Branam would be a good witness for the defense. Trial counsel testified that Ms. Branam was reluctant to testify, however, because "she felt that testifying might cause her some professional problems." There was an ice storm on the night before Ms. Branam was scheduled to testify. On the morning of Ms. Markham's and Ms. Branam's scheduled testimonies, trial counsel spoke to both witnesses. Ms. Markham, who had been staying with Ms. Branam, stated that Ms. Branam "was completely out of control and she was afraid of [Ms. Branam]." Ms. Markham told trial counsel that Ms. Branam "had basically destroyed her house in a fit of rage that night." Trial counsel spoke to Ms. Branam, and Ms. Branam sounded "completely distraught" and "under the influence of pills and alcohol." Ms. Branam told trial counsel that she did not want to testify because she felt

her reputation in the music industry would be ruined. Ms. Branam "[d]id not want to be involved in any way" in Petitioner's case. Trial counsel believed that Ms. Branam would harm Petitioner's case if he "forced her to testify." Trial counsel also learned that Petitioner had been staying in Ms. Branam's home, and trial counsel testified that "[wa]s probably why [the State] didn't want her to be a witness." Trial counsel testified that "whatever little benefit" Ms. Branam's testimony would have been to Petitioner's defense was greatly offset by her mental state at the time of Petitioner's trial.

Trial counsel testified that Ms. Markham "did a great job" testifying for the defense, as did Petitioner and Larry Flair, one of the investigators hired by the defense. Trial counsel spoke to Ms. Branam after trial, and "she [wa]s apparently unhappy that [Petitioner] was convicted, but she was afraid that everyone would throw mud at her if she testified." Ms. Branam nevertheless "agreed to testify at [Petitioner's] sentencing hearing[.]" Ms. Branam's testimony at the sentencing hearing was consistent with Ms. Markham's trial testimony.

Trial counsel testified that he interviewed several witnesses in connection with a confrontation between the victim and another individual before entering the Full Moon Saloon, a bar that Petitioner, the victim, and others went to before going to Petitioner's bar. Trial counsel did not specifically recall Ken Ryan or Samantha Barrett in connection to the Full Moon Saloon event. Trial counsel testified that Jarred Ashley was the "primary person" he interviewed about the incident. He testified that Mr. Ashley was "a very credible person and his testimony would have hurt" Petitioner. Trial counsel explained Mr. Ashley stated that the victim had been drinking on the night of the incident, but that he "never had a firearm." Mr. Ashley stated that Petitioner "had a terrible temper," and Mr. Ashley had seen Petitioner "with hundreds of guns." Mr. Ashley told trial counsel "nothing about any violent episode" that occurred.

Trial counsel testified that he wanted to call Stacy McCoy as a defense witness to refute any potential allegation by the State that Petitioner had a prior history of violent behavior. He testified, however, that Ms. McCoy admitted to trial counsel that she had given perjured testimony in a case in which Petitioner was charged with domestic assault against Ms. McCoy. Trial counsel testified that Ms. McCoy stated that Petitioner "had induced her to lie at the preliminary hearing" and that Petitioner had in fact assaulted her. Trial counsel testified that Petitioner denied that he persuaded Ms. McCoy to give false testimony. Trial counsel determined that it would be unethical to call Ms. McCoy to testify at Petitioner's trial.

Trial counsel testified that he did not call an expert witness to testify about any potential drug interaction by the victim's use of Adderall. Trial counsel testified that the victim was "very, very intoxicated, and the relatively minor amount of Adderall" would

not have significantly affected his behavior. Trial counsel cross-examined the medical examiner at trial, and she confirmed that the drug "would have an additive [e]ffect to some degree, but would not turn [the victim] into a raging maniac."

Trial counsel described the victim as "an enormous person," and he emphasized the victim's size at trial to bolster the defense theory that Petitioner was afraid of the victim. Trial counsel testified there was evidence of a prior violent act by the victim against a police officer, however, trial counsel decided against introducing such evidence. He explained, "we believed that if we went after [the victim]'s character, then that would open the door to an assault on [Petitioner]'s character." Trial counsel believed that Petitioner "would be the loser of that battle."

Trial counsel testified that he was aware that Petitioner had accused a police officer of stealing one of his guns. Petitioner accused Detective Peck of being aware of the theft and covering it up to protect the officer. Trial counsel did not question Detective Peck or any of the police witnesses about the allegation because he found no proof to substantiate the claim. Trial counsel testified, "[t]here was never any proof anywhere that the officer had actually done that."

Trial counsel testified that he believed "there might have been a viable suppression issue of [Petitioner]'s statement to Detective Peck." Trial counsel believed it was a "close question" whether the interview was custodial. Trial counsel discussed the suppression issue with Petitioner. Trial counsel testified that he decided against filing a motion to suppress for [m]ultiple reasons." He explained that Petitioner would have to testify "to present his side of things." Petitioner maintained that he acted in self-defense and that he was afraid of the victim. Trial counsel testified that Petitioner's testimony was important to explain the inconsistencies in his different statements about the shooting. Petitioner "was very evasive" in the 911 call about what had occurred, and he told officers who arrived at the scene that the victim had tried to rob him.

Trial counsel also explained that even if Petitioner's statement had been suppressed, the State could have used it to impeach Petitioner on cross-examination. Trial counsel wanted to "soften" the impact of the statement by having the State introduce it in its case-in-chief, rather than "hitting [Petitioner] with it cold" during his testimony. Trial counsel testified that Detective Peck was a "vulnerable" witness for the State because he had committed a "colossal number of errors" in the case. Trial counsel made "a very calculated strategic decision" to allow the statement to be admitted during Detective Peck's testimony so that trial counsel could cross-examine him about his "horrible investigation." Trial counsel also testified that he believed the statement was in some ways exculpatory. Petitioner told Detective Peck that he was afraid of the victim, and Petitioner appeared "visibly shaken" in the video of the interview.

Trial counsel did not call Defendant's mother, Sue Tucker, to testify at trial because her testimony was relevant to the suppression issue of whether Petitioner was in custody at the time of his statement. When trial counsel decided against seeking suppression of Petitioner's statement, her testimony was not needed. Trial counsel testified that Ms. Tucker "would have made a great character witness, but [he] didn't want to open the door to character proof."

Ms. Tucker testified that she arrived at the scene of the shooting and saw several emergency vehicles. She and her husband saw Petitioner with some police officers. She testified that officers told them to wait in their vehicle, and they were not allowed to speak to Petitioner for two or three hours. Petitioner did not want to leave with Detective Peck, and he told Ms. Tucker to contact his attorney. Ms. Tucker offered to drive Petitioner to the police station, but police refused to allow Petitioner to go with her, and they placed handcuffs on Petitioner. Ms. Tucker did not recall trial counsel telling her that Ms. McCoy had lied at the preliminary hearing in the domestic assault case.

Ms. Barrett testified that she was bartending at the Full Moon Saloon on the night of November 22-23, 2013. She testified that the bar was busy that night because Shooter Jennings was performing there. Ms. Barrett remembered being "really nervous" that night about seeing John Hensley, her former boyfriend and Mr. Jennings's manager. Ms. Barrett recalled there being a "commotion" that night, but she did not know who was involved. She testified that it would have been recorded on the bar's security cameras. She testified that the security camera footage "rolled over [ ] once every seven days" unless it was saved. She testified that Petitioner did not appear to be intoxicated. On cross-examination, Ms. Barrett testified that she did not "remember specifics of the confrontation."

Petitioner testified that he asked trial counsel to contact witnesses and obtain video from the security cameras at the Full Moon Saloon. He testified that the victim was intoxicated, and the victim told him that he "had been partying" that day. Petitioner testified that the victim engaged in "a physical shoving match" with another patron at the Full Moon Saloon. He testified that the victim and patron were separated before the altercation escalated. Petitioner testified that Ken Ryan, the doorman at the Full Moon Saloon, also had an altercation with the victim. According to Petitioner, Mr. Ryan stopped the victim from entering because the bar was at capacity, but Mr. Hensley convinced Mr. Ryan to allow the victim to enter. Petitioner testified that Mr. Hensley had died from an overdose since the incident occurred.

Petitioner testified that he had known the victim for ten years. He testified that he "had no problem being around [him] sober[,]" but Petitioner did not like being around the

victim "altered[.]" Petitioner testified that the victim was "heavily altered" on the night of the incident.

Petitioner testified that he wanted trial counsel to get his statement to police suppressed because he was "not thinking straight" when he gave the statement. Petitioner testified that he was not free to leave and that an officer had taken his cell phone and ordered him to stand outside the bar in the cold and rain without a jacket for several hours before he was handcuffed and placed in the back of a patrol car. Petitioner testified that he had not slept in 30 hours and that he had not eaten "for many, many hours." He testified, "I was in pretty bad shape there, I was freezing cold. I was in shock." Petitioner denied that he was intoxicated. He requested medical attention, but police denied his request. When Petitioner asked trial counsel to suppress the statement, trial counsel told Petitioner, "*Miranda* doesn't mean anything in Tennessee."

Petitioner testified that he was diagnosed with post-traumatic stress disorder as a result of "trauma when he was younger." He testified that he's "overly cautio[u]s about things and notice[s] when people switch." Petitioner testified that he asked trial counsel to consult an expert to testify about the combined effects of alcohol and amphetamines on a person. He also testified that the defense was provided with x-rays of the victim which showed that the victim had micro fractures in his skull. Petitioner wanted trial counsel to consult an expert to testify that the victim might have suffered from chronic traumatic encephalopathy ("CTE"), which may have caused the victim to be aggressive. Petitioner also wanted trial counsel to call a firearms expert to testify about the differences between a Taurus Judge revolver and a Smith and Wesson pistol and the ammunition used in both. Petitioner testified, "I didn't feel that that was going to happen with the State's expert. I figured we need to have our own."

Petitioner disagreed with trial counsel's decision not to call Ms. Branam to testify at trial. He testified that she would have been "a great witness." Petitioner also disagreed with trial counsel's decision not to call Ms. McCoy as a witness. He testified that Ms. McCoy would have testified that she refused to work at his bar whenever the victim was performing because she did not approve of the way the victim treated her or the staff. Petitioner denied that he asked Ms. McCoy to lie at the preliminary hearing on the domestic assault charge. He also denied that trial counsel told him that Ms. McCoy admitted to lying at the preliminary hearing.

On cross-examination, Petitioner testified that trial counsel "misremembered" several facts from the case. Petitioner agreed that trial counsel spent a lot of time working on his case and that they had multiple discussions about his case.

In a written order denying relief, the post-conviction court concluded that Petitioner failed to prove that trial counsel's performance was deficient or that Petitioner was prejudiced by any of counsel's alleged deficiencies. The post-conviction court found, "[w]hile the Petitioner may not have agreed with every tactical decision [trial counsel] made and is clearly displeased with the jury's verdict, [trial counsel]'s representation in this case was extremely thorough and he was well-prepared for trial."

*Analysis*

Petitioner contends that his trial counsel was deficient for: 1) failing to adequately investigate, interview, and call several witnesses at trial; 2) failing to file a motion to suppress Petitioner's statement to police; 3) failing to cross-examine the State's witnesses about the victim's character for peacefulness with evidence of the victim's propensity for violence; and 4) failing to cross-examine investigating officers about an incident in 2013 in which Petitioner alleged one of the officers stole a pistol from his home. Petitioner also contends he was denied his right to a fair trial due to severe weather and by the State's use of testimony that the prosecutor should have known was false.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C,A. § 40-30-103 (2019); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2019); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective

at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id*. The stronger the proof of guilt presented at trial, the more difficult it is to prove the prejudice prong of *Strickland*. When proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Randy Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice), *perm. app. denied* (Tenn. Sept. 19, 2012); *Raymond E. McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of item of evidence at trial).

*Failure to call witnesses and introduce exhibits*

Petitioner contends that trial counsel was ineffective for failing to call a number of witnesses at trial. Petitioner asserts that trial counsel should have called the following lay witnesses to testify at trial: Ms. Branam, Mr. Ryan, Ms. Barrett, Mr. Hensley, and Ms. McCoy. Petitioner also asserts that trial counsel was ineffective for failing to call an expert witness to testify that Petitioner suffered from post-traumatic stress disorder, a medical expert to testify about the victim's possible pre-existing head injuries and drug interactions, as well as "firearms experts to explain nuances regarding the weapon and ammunition used."

The post-conviction court found that Petitioner failed to establish that he was prejudiced by trial counsel's failure to call the witnesses, noting that the only two witnesses to testify at the post-conviction hearing were Ms. Barrett and Ms. Tucker. Petitioner does not argue that Ms. Tucker should have been called as a witness at the trial.

The post-conviction court stated, "[w]hile the Petitioner has made claims about what most of the remaining witnesses would have testified to, the [c]ourt cannot rely on

the Petitioner's summaries of that proposed testimony to allow the [c]ourt to evaluate the issue of prejudice." *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Petitioner failed to call Mr. Ryan, Ms. McCoy, a medical expert, or a firearms expert. Without the testimony of these witnesses at the post-conviction hearing, Petitioner cannot demonstrate prejudice. *Id.* at 758.

Petitioner acknowledges his failure to demonstrate prejudice in failing to call Mr. Ryan to testify at the post-conviction hearing; however, Petitioner asks this court to remand to the post-conviction court "with instructions to call Mr. Ryan to testify" because Petitioner claims that Mr. Ryan agreed to testify at the post-conviction hearing but was unable to travel due to car trouble. The record shows that Petitioner received a full and fair hearing in the post-conviction court. The record does not reflect that Petitioner was denied the opportunity to call Mr. Ryan or that Petitioner requested the court continue the hearing so that Mr. Ryan or any other witness would be available to testify. "A full and fair hearing" has taken place when "the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40-30-106(h).

Regarding Mr. Hensley, who passed away sometime between the time of the shooting and Petitioner's post-conviction hearing, Petitioner asserts that he would have testified about an encounter with the victim at the door in which the victim became aggressive toward Mr. Ryan when Mr. Ryan refused the victim's entry into the Full Moon Saloon. Even if the post-conviction court found credible Petitioner's testimony about what Mr. Hensley would have testified to, the post-conviction court concluded trial counsel's decision not to call witnesses was not deficient representation.

The post-conviction court concluded that trial counsel made a reasonably based strategic decision not to introduce proof about the victim's behavior at the Full Moon Saloon on the night of the shooting. Petitioner contends that Mr. Ryan, Ms. Barrett, and Mr. Hensley would have testified that the victim was involved in an altercation at the Full Moon Saloon and exhibited aggressive behavior. Trial counsel did not want to introduce character evidence about the victim because that would permit character evidence of Petitioner to be admissible. We also note that Ms. Barrett testified at the post-conviction hearing that although she was aware of some "commotion," she did not know who was involved or remember any specifics about the incident.

The post-conviction court found:

- 11 -

Had the Petitioner presented any of this testimony at trial – either as to the general character of himself or the victim or as to the victim's aggressive behavior on the night in question – the State would have been permitted to introduce evidence of the Petitioner's character for violence. As [trial counsel] discussed, he made a strategic decision to avoid any possibility of a character battle between the Petitioner and the victim, as he felt that was a battle the Petitioner would not win. This is precisely the sort of tactical decision that the [c]ourt will not [ ] second[-]guess in the post-conviction context.

Additionally, the post-conviction court afforded deference to trial counsel's strategy not to introduce proof about the victim's behavior at the Full Moon Saloon because such proof was contrary to the defense strategy:

[Trial counsel] explained that he felt proof that the victim had been aggressive earlier in the evening was inconsistent with the defense theory that the victim suddenly snapped and would have raised questions for the jury about why the Petitioner even allowed the victim to come with him in the first place if he [was] behaving so aggressively. The [c]ourt finds this to be another reasonable strategic rationale for not calling witnesses from Full Moon Saloon.

Regarding trial counsel's failure to call Ms. Branam to testify at Petitioner's trial, the post-conviction court found:

[Trial counsel] testified at length as to why he did not call Ms. Bran[]am, and the [c]ourt finds [trial counsel]'s decision in that regard to be reasonable. Whatever potential benefit might have been gained from Ms. Bran[]am's testimony was significantly outweighed by the possible damage she would have done to the Petitioner's case, given her intoxication and hostility to the defense team at the time she would have been called to testify. In light of that danger, the [c]ourt finds that [trial counsel]'s decision not to call Ms. Bran[]am was reasonable. Thus, the [c]ourt finds that [trial counsel] was not deficient for failing to call Ms. Bran[]am.

Petitioner contends that based upon Ms. Branam's testimony at Petitioner's sentencing hearing, Ms. Branam would have corroborated Petitioner's own testimony at trial, as well as Ms. Markham's testimony that she and Mr. Howard were in the bathroom together, and therefore, Mr. Howard could not have witnessed or heard the exchange between the victim and Petitioner before the shooting. We note, however, that Ms.

- 12 -

Markham testified herself at Petitioner's trial that she witnessed the exchange between the victim and Petitioner before the shooting.

Nevertheless, we agree with the post-conviction court's conclusion that trial counsel made a reasonably based strategic decision not to call Ms. Branam as a witness. Trial counsel testified that on the morning of Ms. Branam's scheduled testimony, Ms. Markham informed him that Ms. Branam "was completely out of control[.]" Trial counsel testified that he spoke to Ms. Branam, and she was distraught and intoxicated. Ms. Branam told trial counsel that she did not want to testify at Petitioner's trial because she felt that it would ruin her reputation in the music industry. Trial counsel believed that Ms. Branam's testimony would harm Petitioner's case given her mental state.

Petitioner asserts that Ms. McCoy was present at the post-conviction hearing and that he was prejudiced by post-conviction counsel's failure to call her to testify at the hearing. The transcript of the hearing shows that Ms. McCoy was among three witnesses who were instructed to leave the courtroom during other witnesses' testimony. The record does not reflect why Ms. McCoy did not testify at the post-conviction hearing. Regardless of the reason Ms. McCoy did not testify at the hearing, the post-conviction court specifically accredited trial counsel's testimony that Ms. McCoy admitted to him that she had perjured herself at the preliminary hearing on Petitioner's domestic assault charge. Trial counsel testified that he considered calling Ms. McCoy as a defense witness at trial to refute any potential allegation by the State that Petitioner had a history of violent behavior. However, trial counsel testified that he could not ethically call Ms. McCoy to testify at Petitioner's trial in light of her disclosure that she had perjured herself at the preliminary hearing and that Petitioner had in fact assaulted her. Furthermore, Petitioner has not shown how Ms. McCoy's testimony would have undermined the outcome of his trial.

The evidence does not preponderate against the post-conviction court's findings. Petitioner failed to demonstrate that, had counsel employed a different trial strategy, a reasonable probability exists that he would have obtained a different result.

Petitioner also claims that he sought the introduction of several exhibits at trial and at the post-conviction hearing "to show material not otherwise properly supported by the current deficient [r]ecord." Those exhibits include the Nashville Fire Department policies about entering a crime scene before it has been cleared by the police department, photographs of the bar area at the Pit and Barrel to impeach Mr. Howard's testimony, and the victim's medical records of the treatment he received for his gunshot wounds. There is nothing in the record to show that Petitioner sought to introduce these exhibits at the post-conviction hearing, nor did Petitioner testify as to why he believed trial counsel should have introduced them at trial. Petitioner again asks this court to remand this case

- 13 -

to the post-conviction court so that the exhibits may be "properly place[d] on the [r]ecord."

All that due process requires in the post-conviction setting is that the petitioner have "'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *House v. State*, 911 S.W.2d 705, 711 (Tenn. 1995) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). Petitioner was provided that in this case. He is not entitled to relief.

*Failure to file a motion to suppress Petitioner's statement to police*

Petitioner contends that trial counsel was deficient for failing to file a "plainly meritorious" motion to suppress. The State responds that the post-conviction court properly concluded that trial counsel had a reasonable strategic rationale for not filing the motion. We agree with the State.

In order to prove prejudice on a claim that counsel was ineffective in failing to file a motion to suppress, a petitioner must show that "(1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed*.

"[T]he failure to file a [meritorious] suppression motion does not constitute *per se* ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). For such a failure to constitute deficient performance, the meritorious nature of the motion must be so plain that "no competent attorney would think a motion to suppress would have failed." *Premo v. Moore*, 562 U.S. 115, 124 (2011). A petitioner must also show that counsel had no reasonable strategic rationale for not filing the motion. *Davis v. Lafler*, 658 F. 3d 525, 537 (6th Cir. 2011).

The post-conviction court found that "Petitioner would have had a reasonable probability of success on a motion to suppress, and [trial counsel] conceded as much when he testified that he felt that he had a sufficient basis to raise the issue in a motion to suppress." The court concluded, however, that trial counsel made "a reasonable strategic decision" not to file a motion to suppress, "as it would have been extremely difficult to properly raise self-defense without the Petitioner testifying." The post-conviction court found that trial counsel's decision to allow the statement to be admitted during the State's case-in-chief, rather than risk the statement being admitted to impeach Petitioner, was "precisely the type of reasonable strategic decision that is not to be second-guessed by the post-conviction court."

- 14 -

Additionally, the post-conviction court concluded that Petitioner failed to establish that he was prejudiced by trial counsel's failure to file the motion to suppress. Trial counsel testified that the statement was in some ways exculpatory and corroborated Petitioner's testimony that he acted in self-defense because he was fearful of the victim.

We agree with the post-conviction court's conclusion that trial counsel's decision not to seek suppression of Petitioner's statement to police was an informed strategic decision based upon adequate preparation. Petitioner is not entitled to relief on this issue.

*Failure to effectively cross-examine witnesses for the State*

Petitioner contends that trial counsel was deficient for failing to cross-examine the State's witnesses about prior acts of violence by the victim. The State responds that the post-conviction court properly concluded that trial counsel was not deficient.

The post-conviction court concluded that trial counsel was not deficient and that he made "a reasonable strategic decision . . . not [to] open the door to evidence of the Petitioner's character for violence."

Tennessee Rule of Evidence 404(a)(1) provides that, if evidence of a trait of character of the victim of the crime is offered by the defendant and admitted under Tennessee Rule of Evidence 404(a)(2), the State may offer "evidence of the same trait of character of the [defendant]. . . ." The Advisory Commission Comment reads, "[i]f the accused attacks the character of the alleged victim, amended Rule 404(a)(1) allows the prosecution to prove the accused's character for the same trait. This is an additional way the accused 'opens the door' to character evidence." *Id*.; *see e.g.*, *State v. Bendale Romero*, No. E2015-00860-CCA-R3-CD, 2016 WL 3437166, at *7 (Tenn. Crim. App. June 15, 2016) (finding that the trial court did not err when it held that the defense witness's testimony regarding prior acts of the victim would "open the door" for the State to offer evidence of the defendant's character for violence), *perm. app. denied* (Tenn. Oct. 19, 2016); *State v. Pamela Taylor*, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at *45 (Tenn. Crim. App. Sept. 30, 2014) (finding that the defendant, after presenting specific acts of violence by the victim to support her first aggressor theory, "'opened the door' to proof of her character when she presented evidence that the victim was the first aggressor and that she had acted in self-defense when she fatally shot the victim"), *perm. app. denied* (Tenn. Jan. 15, 2015); *State v. Jason Allen Cobb*, No. W2011-02437-CCA-R3-CD, 2013 WL 1223386, at *13 (Tenn. Crim. App. Mar. 26, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013).

Trial counsel testified that he "believed that if we went after [the victim]'s character, then that would open the door to an assault on [Petitioner]'s character." Trial counsel believed that Petitioner "would be the loser of that battle." For the same reasons trial counsel decided against calling Ms. McCoy to testify, knowing that she admitted to him that Petitioner had assaulted her and persuaded her to lie under oath about it, trial counsel's strategy to avoid evidence of Petitioner's character was well-founded.

Petitioner also contends that trial counsel was ineffective for failing to cross-examine Officer Kent and Detective Peck about an allegation that Officer Kent stole a pistol from Petitioner's home in an unrelated incident in 2013 and that Detective Peck investigated the incident. The post-conviction court found that trial counsel was not deficient and that it was a reasonable strategic decision because "a jury could easily have rejected the Petitioner's claim absent independent corroborating evidence and linked the Petitioner with being untruthful."

The evidence does not preponderate against the post-conviction court's findings. Petitioner presented no proof at the post-conviction hearing to substantiate his allegation. Petitioner is not entitled to relief.

*Severe weather during Petitioner's trial*

Petitioner contends that inclement weather resulted in his procedural due process rights being violated. Petitioner's argument is unclear. Petitioner concedes that he was "unable to find a case on point," but he asserts that the winter weather "affect[ed] all levels of trial[,] from the reasonableness of the jury being forced to be present while outdoor conditions worsen[ed], to difficulties described with witnesses like Susan Bran[]am[.]" Petitioner asserts that "the weather was an unprecedented ordeal that affected every aspect of the trial."

The State responds that Petitioner has waived this issue because he failed to raise it at trial or on direct appeal. We agree with the State. Tennessee Code Annotated section 40-30-106(g) states:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

T.C.A. § 40-30-106(g); *see also* Tenn. Sup. Ct. R. 28, § 2(D) ("A ground for relief is waived if the petitioner or petitioner's counsel failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.").

Petitioner raised this issue for the first time in his *pro se* petition for post-conviction relief. Accordingly, the issue is waived.

*Alleged improper prosecutorial conduct*

Petitioner contends that the State engaged in prosecutorial misconduct by eliciting testimony at trial that it should have known was false. The State responds that the issue is waived because Petitioner raised it for the first time on appeal. The issue was not raised in Petitioner's post-conviction petitions, and it was not addressed by the post-conviction court, because the issue stems from the above excerpt from the post-conviction court's order.

Petitioner's assertion is based on the post-conviction court's order, in which the court summarized the testimony at the post-conviction hearing. Trial counsel testified at the hearing that Mr. Howard "lied [at trial] about being in the bathroom and he said he saw and heard things that he couldn't have seen if you believe Ms. Markham and Ms. Branam." In its order denying relief, the post-conviction court stated, "Mr. Howard lied in his testimony during trial. Mr. Howard testified that he witnessed or heard an exchange prior to the shooting that he could not have witnessed because he was in the bathroom engaging in sexual intercourse with Ms. Markham."

Even if the issue was not waived, it is without merit. When a witness testifies falsely, either on direct or cross-examination, the State has an affirmative duty to correct the false testimony. *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). To prevail on his claim that the State knowingly presented false testimony, Petitioner must establish by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the [S]tate either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." *Roger Morris Bell v. State*, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App. Mar. 15, 1995).

Petitioner has failed to establish that the State knowingly elicited false testimony. Mr. Howard was called by the State in its case-in-chief at Petitioner's trial. Trial counsel challenged Mr. Howard's testimony by calling Ms. Markham to testify on behalf of Petitioner. Ms. Markham testified that she and Mr. Howard were "heavily" intoxicated on the night of the shooting and that she and Mr. Howard were in the bathroom having a "rendezvous" just before they left the Pit and Barrel. We note, however, that she testified that she also witnessed the exchange between the victim and Petitioner before the shooting. Trial counsel's opinion on the veracity of Mr. Howard's account of the shooting and how it informed his decision to call Ms. Markham to rebut his testimony is not evidence that the State knowingly elicited false testimony. Petitioner is not entitled to relief on this issue.

*Cumulative effect of counsel's deficiencies*

Finally, Petitioner contends that "trial counsel's errors, even if harmless in isolation, had the overall effect of ineffective assistance of counsel[.]" The doctrine of cumulative errors recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). However, this court has held that a petitioner "who has failed to show that he received constitutionally deficient representation on any single issue may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors." *Tracy F. Leonard v. State*, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *21 (Tenn. Crim. App. July 5, 2007), *perm. app. denied* (Tenn. Sept. 13, 2007). The post-conviction court rejected each of Petitioner's individual allegations of error, and we have determined that the record supports the court's determination in each instance. Petitioner is not entitled to relief on this issue.

CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the denial of the Petitioner's petition for post-conviction relief.

_____
THOMAS T. WOODALL, JUDGE